UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| CHRISTINA MARIE BLUNDELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CV 03-B-0847-NE |
| ) | |
| THE HEALTH CARE AUTHORITY ) | |
| OF THE CITY OF HUNTSVILLE ) | **ENTERED** |
| ("Huntsville Hospital"), ) | |
| ) | NOV - 9 2004 |
| Defendant. ) | |

### MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment, (doc. 11),[1] and plaintiff's Motion to File Supplemental Brief, (doc. 27). Plaintiff Christina Marie Blundell has sued her employer, the Health Care Authority of the City of Huntsville, "Huntsville Hospital", alleging that defendant discriminated against her on the basis of her disability in violation of federal law. Plaintiff also alleges state-law causes of action for negligent training, supervision, and retention. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 11), is due to be granted, and plaintiff's Motion to File Supplemental Brief, (doc. 27), is due to be denied.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)).

## II. STATEMENT OF FACTS[2]

Plaintiff began working for defendant as a Nurse Tech on March 24, 1997. (Doc. 26, Ex. 1.) In a Physical Health Screening dated March 19, 1997, she told defendant that she suffered a pulled muscle in her back in the Fall of 1995, but had "no problem now." (Doc. 26, Ex. 2.) In May 1997, plaintiff re-injured her back and, thereafter, she had "progressive complaints of pain and deterioration in her physical abilities" related to her back problems. (Doc. 13 at 134; doc. 21 at 10.) Plaintiff alleges that defendant discriminated against her by failing to accommodate her disability, which she alleges is chronic pain, when it refused to assign her to the position of triage registered nurse ["RN"] on a permanent basis.

Plaintiff suffers from "facet syndrome, lumbar and cervical [disc] disease, specifically bulging [discs], and also fibromyalgia," which causes plaintiff to have chronic pain. (Doc. 21 at 92.) Dr. Morris Scherlis, a board-certified specialist in the treatment of chronic pain,[3] diagnosed plaintiff with "radiculities or inflamation of a nerve," which causes pain in her leg, and diskogenic pain caused by degenerating disks that trigger pain signals. (Doc. 22 at 37.) Dr. Scherlis confirmed "a L4-5 disk bulge with a annular tear, anterior wedging of that appeared chronic," and "very mild dessication of L5-S1." (*Id.* at 10.)

---

[2] Because the court finds that summary judgment is due to be granted because plaintiff has not presented sufficient evidence that she is "disabled" under the ADA, the court's Statement of Facts is limited to those facts relevant to the issue of disability under the ADA.

[3] Doc. 22 at 4.

Activities, such as "heavy lifting [and] bending at the waist repeatedly in awkward positions" may exacerbate plaintiff's pain. (Doc. 22 at 38.) Her condition makes it difficult for her to walk during an episode of acute pain. (Doc. 21 at 11.) Her episodes of acute pain, "flare ups," are infrequent and last for one to two days. (*Id*. at 11, 12.)

With regard to her physical limitations, plaintiff testified as follows:

> Q. Do any of your health conditions interfere with your ability to walk?
>
> A. Sometimes.
>
> Q. Explain that, if you would.
>
> A. If the pain in my back, for example, like, on a bad day – you have good days and bad days with chronic pain. Some days are better than others. It's *rare*, but sometimes I can't walk at all. I have to wait for inflammation or whatever to go away, the pain. Or the nerves or whatever is back there that's irritated.
>
> Q. You say, "rare." What do you mean by rare?
>
> A. Maybe once every two months it can get really bad. But I don't hope for that. I'm just saying it can happen. Every once in awhile, something flares up is the way I say it. The back is irritated for some reason. And sometimes I don't have to do anything at all. It just happens.
>
> Q. Can you work when it flares up like that?
>
> A. Yes. And I have. I work.
>
> Q. You work, nevertheless; work through it?
>
> A. Yes.
>
> . . .
>
> Q. You were saying that your health condition does not interfere with your ability to see, hear, speak, breathe, learn, or perform manual tasks?

4

A. Right.

Q. Nor does it interfere with your ability to take care of yourself, including bathing, brushing your teeth, brushing your hair, combing, washing your hair, doing housework, cook, dress, all those things, right?

A. If it's a good day, I don't have any problem at all.

Q. And if it's a bad day, you can do it; its just not very comfortable?

A. I might be a little slow. Might need to have help with putting a shirt on if the fibromyalgia is bad or something but –

Q. Can you lift?

A. I can, but I shouldn't. Let's put it – no. I don't need to.

Q. Is there some limit on what you should or should not lift?

A. I think [Dr. Scott] Royster said no more than 30 pounds. Really shouldn't.

Q. But you can lift up to 30?

A. Yeah. If I'm careful.

Q. Can you reach?

A. Depend how far, but, I can. Yeah, I mean (indicating) – yeah.

Q. Can you sit? Sometimes it gets uncomfortable?

A. Sometimes it does.

Q. Other than that?

A. As long as I can change my position, I'm okay.

Q. Can you stand?

A. Yes.

(Doc.13 at 192-93, 195-97 (emphasis added).)

Plaintiff did not have a functional capacity evaluation, (doc. 21 at 13), which objectively tests "what [plaintiff] can physically do within pain tolerance[, and] pain tolerance is a very broad term," (doc. 23 at 27-28). Plaintiff did not have a functional capacity evaluation because her insurance would not cover the cost of such testing. (Doc. 21 at 13, 115.) However, Dr. Scherlis's treatment notes indicate that his nurse gave plaintiff an "activity score of ten," indicating that plaintiff was "able to do everything pretty much that she wants to during the day. . . . She might have pain[,] but she's able to do it." (Doc. 22 at 9.)

Dr. Morris Seymour, a board-certified orthopaedic surgeon who focuses on spine surgery, (doc. 23 at 4), recommended physical therapy, medication, and modification of plaintiff's activities as treatment for her back pain, (*id.* at 9). He said:

> She was working 12 hours. I told her if she would modify that and not work such a heavy schedule that she may find something that she could accommodate to allow her to function comfortably but I told her she was going to have problems from time to time. Some days she'd feel good and other days it would be a significant problem for her.

(*Id.*) He concluded from his examination that plaintiff "had some arthritis in her back. She had some chronic pain going on and that was pretty much it." (*Id.* at 14.) He testified, "I thought this thing with time would get better. (*Id.*)

Dr. Scherlis referred plaintiff to Joel Pickett, M.D, a board-certified neurosurgeon. (Doc. 20 at 5.) Dr. Pickett described plaintiff's back as exhibiting "some degenerative changes[.] . . . Not terrible, but some wear and tear." (*Id.* at 23.) He tested her strength, and

he found "her strength was normal with the exception of questionably some very mild weakness in the quadriceps muscle." (*Id*. at 13.) He noted "some slight weakness but it was very subtle and difficult to tell if it was truly weak or if she was just giving a suboptimal effort because of pain." (*Id*. at 40-41.) He did not find any weakness that would prevent plaintiff from turning a patient, helping patients walk from one place to another, pushing a wheelchair, or pulling a stretcher. (*Id*. at 35-37.) However, he testified that her pain might "interfere with any activity at all," but he had "no way of proving that it did or it didn't." (*Id*. at 37.) Dr. Pickett recommended that plaintiff "treat [her pain] conservatively with nonsterodial anti-inflammatory and some regular exercise." (*Id*. at 22.)

Dr. Seymour testified that he believed plaintiff could perform the job of an RN because "[t]here are so many things you can do ranging from a heavy active nurse to essentially a desk job, (*id*. at 29-30). Similarly, Dr. Scherlis testified:

> I don't think I put her on any restrictions at least certainly not that I can remember. See, the problem with that as a registered nurse, you know, sometimes these folks are asked to turn and lift heavy patients, thinks like that. I think it would be prudent to limit some of that and I don't think anybody can recommend against that given her scan and her history, but at the same time as a registered nurse there's plenty of things to be done that are reasonable with back problems. Certainly a floor nurse is able to give medications and things like that most of the time without hurting [her] back. So I think there would be a place back for her to continue working in the job of registered nurse but maybe not by doing things that a perfectly normal person can.

(Doc. 22 at 21-22.)

7

Dr. Royster, plaintiff's attending physician, testified that he believed plaintiff was capable of doing the physical work of a triage nurse based on what plaintiff had told him. (*See* doc. 21 at 58-61.) He testified:

> A. My understanding from conversations with [plaintiff] was that there was very limited activity at the triage desk; that there was a nurse – an RN that was assigned to that desk every shift and that that person's main responsibility was checking patients in, filling out paperwork, and then passing that over to another RN – well, I believe they would take vital signs and such and then passing that person over to another person who would then facilitate their moving to and from the back. . . .
>
> . . .
>
> So that that position that she wanted required very little, if any, of the activities that tended to exacerbate her pain.
>
> Q. At least to the extent that she described them to you?
>
> A. Yes, sir.
>
> Q. If it is the case that nurses assigned to that position; that it, to the triage desk, were required as functions of their job to assist patients to the back or assist patients to the desk or assist patients while they were at the triage desk – would that have been a job that she could have been assigned to safely in your judgment?
>
> A. From what was related to me, if any of those activities were asked of her, they were of such limited amount of physical exertion to where she could handle that.
>
> . . .
>
> A. She was – you know, [plaintiff's] opinion was that she went to school to be an RN. She felt that she could do the job of an RN as long as she was placed in that position that she had been in for a little while and was successfully doing.

8

>Q. And in her opinion was that she could do the physical work of a nurse assigned to that position because of the reasons you stated?
>
>A. Yes, sir.
>
>Q. Even though it did involve some lifting and pushing and pulling?
>
>A. Yes, sir.
>
>Q. Are you comfortable with that?
>
>A. I had no need – I had no need to doubt her.
>
>. . .
>
>Q. In your opinion, [plaintiff] could push wheelchairs with patients, could push stretchers and pull stretchers with patients, and/or could assist people doing that as long as it was relatively infrequent and it didn't hurt her?
>
>A. Correct.
>
>Q. But if it did hurt her, she couldn't do any of those things?
>
>A. Correct.
>
>Q. Even if they were infrequent?
>
>A. Yes, sir.

(*Id.*)

Dr. Royster testified that plaintiff's conditions cause her to have difficulty walking during an episode of acute pain. (Doc. 21 at 11.) Such episodes, however, are "infrequent," and last "one or two days generally." (*Id.*) Plaintiff sees Dr. Royster "generally on a monthly basis." (*Id.* at 12.) When Dr. Royster saw plaintiff in his office during an acute episode, she "needed the assistance of a family member to assist her from the car to a chair

. . . and that kind of stuff." (*Id.* at 11.) Dr. Royster testified that plaintiff has needed such assistance only 5% to 10% of the time. (*Id.* at 12.) He testified that "the majority of time, [plaintiff's] level of pain was consistent and stable," and that "[h]er level of pain was controlled to the point where she could function at the level that she was currently functioning at." (*Id.* at 36.) He testified that plaintiff pain was moderate 90% of the time and severe 10% of the time. (*Id.* at 114.) He testified that plaintiff can do anything "as long as she feels like she can do it without pain." (*Id.* at 114-15.)

### III. DISCUSSION

#### A. ADA CLAIM

The Americans with Disabilities Act ["ADA"] prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a)(1995). "The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims." *Hilburn v. Murate Electronics North America*, 181 F.3d 1220, 1226 (11th Cir. 1999).

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory-treatment cases. First, the plaintiff must establish a prima facie case of discrimination. . . . The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment. [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired [for a legitimate, nondiscriminatory

reason], the *McDonnell Douglas* framework--with its presumptions and burdens--disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

    Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000)(internal citations and quotations omitted).

    To establish a prima facie case under the ADA, plaintiff must prove that: (1) she is disabled; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability. *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000). Defendant contends that plaintiff cannot establish a prima facie case of disability discrimination because she cannot prove that she was "disabled" within the meaning of the ADA. (*See generally* Def. Br. in Supp. of Mot. for Summ. J. at 5-9.)

    A "disability . . . with respect to an individual" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). "[T]hese terms [*substantially limits* one or more *major life activities*] need to be interpreted *strictly* to create a *demanding standard* for qualifying as disabled . . . ." *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184,

11

198 (2002)(emphasis added). "[W]hether a person has a disability under the ADA is an individualized inquiry. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999)(citing *Bragdon v. Abbott*, 524 U.S. 624, 641-642 (1998); 29 C.F. R. pt. 1630, App.§ 1630.2(j)).

Plaintiff suffers from degenerative disc disease, facet syndrome and fibromyalgia, and contends that "[t]hese are permanent and severe [physical] impairments that substantially affect various major life activities." (Doc. 1 ¶ 7.) The record contains evidence that plaintiff has constant pain that is "moderate" 90% of the time and "severe" 10% of the time. (Doc. 21 at 114.) Plaintiff contends that, during bouts of extreme or exacerbated pain, she has difficulty standing, walking, working or performing manual tasks. Because plaintiff "claim[s] to have a physical impairment that substantially limits more than one of [her] major life activities," the court's "consideration 'proceeds in three steps.'" *Maynard v. Pneumatic Products Corp.*, 233 F.3d 1344, 1346 (11th Cir. 2000)(quoting *Bragdon*, 524 U.S. at 631), *opinion vacated and superseded on other grounds on reconsideration*, 256 F.3d 1259 (11th Cir. 2001).[4]

> First, [the court] must decide whether [plaintiff's degenerative disc disease, facet syndrome and fibromyalgia are] physical impairment[s]. Second, [the court] must decide whether the activities [plaintiff] claims are substantially limited by [her conditions] qualify as major life activities under the ADA. Finally, [the court] must decide whether plaintiff's conditions] substantially limit[ ] the major life activities [she has] identified.

*Id.* at 1346-47 (internal citations omitted).

---

[4] On reconsideration the Eleventh Circuit Court of Appeals vacated its prior opinion and upheld dismissal of plaintiff's claims on the ground that plaintiff had not timely filed an EEOC charge. *Maynard*, 256 F.3d at 1264.

### 1. Physical Impairments

For purposes of summary judgment, the court finds that plaintiff suffers from degenerative disc disease, facet syndrome, or fibromyalgia, which are physical impairments.

### 2. Major Life Activities

"'Major life activities' . . . refers to those activities that are of central importance to daily life," *Toyota Motor Manufacturing*, 534 U.S. at 197, and include such functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," 29 C.F.R. § 1630.2(i).

Plaintiff contends that her major life activities of "[p]erforming manual tasks, walking, standing, and working" are limited by her physical impairments. (*See* Pl. Br. in Opp. to Mot. for Summ. J. at 13-14.) The court finds, for purposes of summary judgment, that these activities – performing manual tasks, walking, standing, and working – qualify as major life activities.

### 3. Substantially Limited

The third step in deciding whether plaintiff is disabled within the meaning of the ADA, is to determine whether the record contains sufficient evidence to support plaintiff's claim that her physical impairments "substantially limit" the major life activities she has identified.

"'Substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'" *Toyota Motor Manufacturing*, 534 U.S. at 196. The regulations state –

(1) The term substantially limits means:

13

> (i) ***Unable*** to perform a major life activity that the average person in the general population can perform; or
>
> (ii) ***Significantly restricted as to the condition, manner or duration*** under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F. R. § 1630.2(j)(1) (emphasis added). A showing that plaintiff has a "minor" or "moderate" limitation of a major life activity is not sufficient to establish disability. *See Toyota Motor*, 534 U.S. at 197 ("The word 'substantial' thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities."); *see Dupre v. Charter Behavioral Health Systems of Lafayette Inc.*, 242 F.3d 610, 614 (5th Cir. 2001)("In the case before us, Dupre's ability to sit or stand in one place for up to one hour at a time before having to walk around makes clear that the 'condition, manner, or duration' under which she is able to sit or stand was not significantly restricted as compared with the average person."); *Weber v. Strippit, Inc.*, 186 F.3d 907, 914 (8th Cir. 1999)("While Weber did face dietary restrictions and difficulty walking long distances or climbing stairs without getting fatigued, these moderate limitations on major life activities do not suffice to constitute a 'disability' under the ADA."), *cert. denied* 528 U.S. 1078 (2000); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999)("It is clear, however, that moderate difficulty experienced while walking does not rise to the level of a disability."); *Jaffe v. Catholic Medical Center*, No. Civ. 02-246-JD, 2003 WL 22768235 at *3 (D.N.H. Nov. 24, 2003)("Moderate restrictions in walking and in doing manual tasks,

14

such as the need to use extra effort and time or unsteadiness, are insufficient to support a disability within the meaning of the ADA.").

According to plaintiff's testimony her major life activities are not *significantly* limited by her physical impairments. (*See* doc. 13 at 192-93, 195-97.) Plaintiff testified that her physical impairments do not interfere with her ability to perform manual tasks. (*Id.* at 193.) She testified that her physical impairments "sometimes" interfere with her ability to walk; she said, "It's rare, but sometimes I can't walk at all." (*Id.* at 192) Such "rare" occasion of acute pain occurs, according to plaintiff, once every two months. (*Id.*) She testified she can stand. (*Id* at 197.) Further, she testified that she was capable of working during a flare-up and that she has worked through a flare-up. (*Id.* at 193.) She also testified that she could push or pull a 30 pound sled "if [she] had to," but she "just [doesn't] do those things to avoid further problems." (*Id.* at 202.)

Plaintiff's attending physician, Dr. Royster, testified he believed plaintiff was capable of doing anything "as frequently as she feels like she can do it without pain." (Doc. 21 at 114-15.) Plaintiff's other treating physicians testified similarly. (*See* doc. 20 at 35-37; doc. 22 at 9.) Dr. Royster only restricted plaintiff from "lifting and pushing" because plaintiff told him that lifting and pushing would increase her pain. (Doc. 13 at 205.) The record does not disclose that all lifting and pulling would increase her pain to a level such that it "substantially limited" a major life activity.

The court finds that the pain associated with plaintiff's physical impairments limits her ability to perform certain major life activities, however, the record, particularly plaintiff's

15

testimony, does not indicate that such limitations are "substantial." Therefore, the court finds that plaintiff has not demonstrated that she is "disabled" within the meaning of the ADA.

### 2. Other ADA Issues

Because the court finds that plaintiff is not "disabled" within the meaning of the ADA, further discussion of whether plaintiff can establish that she is a qualified individual and whether defendant discriminated against her because of her disability are pretermitted.

## B. NEGLIGENT TRAINING, SUPERVISION, AND RETENTION

In Count Two of her Complaint, plaintiff alleges, "This is a claim arising under the law of the State of Alabama to redress the Defendant's negligent and/or malicious retention, training and supervision of Chris Darnell, Cynthia Taylor, and Barb Pierce." (Doc. 1 ¶ 19.) Barb Pierce is defendant's ER Director, Chris Darnell is an ER supervisor, and Cynthia Taylor works in defendant's Human Resources Department. Plaintiff alleges that these individuals failed to accommodate her disability.

Alabama law recognizes claims for negligent or wanton training, supervision and retention. *Poplin v. Bestway Express*, 286 F. Supp. 2d 1316, 1318 (M.D. Ala. 2003)(citing *CP & B Enters., Inc. v. Mellert*, 762 So.2d 356, 362 (Ala. 2000); *Big B. Inc. v. Cottingham*, 634 So.2d 999, 1002-03 (Ala. 1993); *Bruck v. Jim Walter Corp.*, 470 So.2d 1141, 1143 (Ala. 1985). These claims are "predicated on the underlying ***tortious*** conduct of an employee." *Stevenson v. Precision Standard, Inc.*, 762 So.2d 820, 824 (Ala. 1999)(emphasis added). Employment discrimination is not a tort under Alabama law. *See Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002).

Plaintiff has not alleged any "tortious conduct" of Darnell, Pierce, and Taylor. Although she argues in her brief that Darnell, Pierce, and Taylor failed to accommodate her disability in violation of the ADA, for the reasons set forth above, the court finds that plaintiff is not disabled pursuant to the terms of the ADA. Therefore, Darnell, Pierce, and Taylor did not violate the Act by failing to accommodate plaintiff, therefore, their failure to accommodate plaintiff cannot supply the "underlying tortious conduct" to support a claim for negligent training, supervision and/or retention under Alabama law.

Plaintiff's claims for negligent training, supervision, and retention will be dismissed.

### IV. MOTION TO FILE SUPPLEMENTAL BRIEF

In her Motion to File Supplemental Brief, plaintiff asks the court for an opportunity to respond to defendant's proposed Memorandum Opinion, which contains 110 pages. The court has not considered defendant's proposed Memorandum Opinion; therefore, plaintiff's request for an opportunity to respond to it will be denied.

### V. CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An order granting defendant's Motion for Summary Judgment and denying plaintiff's Motion to File Supplemental Brief will be entered contemporaneously with this Memorandum Opinion.

DONE this ___9th___ day of November, 2004.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge